HENRY G. McCOMB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McComb v. Commissioner
Docket No. 658-74.
United States Tax Court
T.C. Memo 1977-176; 1977 Tax Ct. Memo LEXIS 265; 36 T.C.M. (CCH) 725; T.C.M. (RIA) 770176; June 9, 1977, Filed J. Vincent Sheehan and Victor J. Orzechowski, for the petitioner. *266 Paul E. Vignone, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of petitioner in the amount of $4,394.78 for the calendar year 1967. The only issue for decision is whether petitioner is entitled to a net operating loss carryback to 1967 from 1970 because of being entitled in 1970 to a theft loss within the meaning of section 165(c)(3), I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, who resided in New York, New York at the time of filing of the petition in this case, filed his individual Federal income tax return for the calendar year 1970 with the District Director of Internal Revenue at Buffalo, New York. Petitioner filed his individual Federal income tax return for the calendar year 1967 with the District Director of Internal Revenue at Albany, New York. During the early part of 1967 petitioner was employed as an engineer. He had an ambition of *267 becoming self-employed by owning a business. In furtherance of that goal, petitioner contacted a business broker in the Rochester, New York area for the purpose of determining whether any business was for sale in which he could apply his background and training. Petitioner obtained the name of the corporation doing business as a business broker by looking through the yellow pages of the Rochester, New York telephone directory. At a meeting arranged by petitioner, he explained his background, education and goals to Donald Leipham, who was president of the brokerage company petitioner had contacted. The name of the brokerage company was Finders Clearing House Corporation (Finders). At that meeting Mr. Leipham informed petitioner that at the time he did not have any listings that involved a technically oriented business, but perhaps the situation would change. Petitioner continued to keep in contact with Mr. Leipham. During a subsequent meeting between petitioner and Mr. Leipham, the latter suggested that petitioner should consider investing in Finders, explaining that the corporation was involved in several activities including real estate brokerage, mortgage brokerage and *268 commodity brokerage. Mr. Leipham also explained that his own background was not technically oriented and a background such as that possessed by petitioner would be advantageous in certain aspects of the business. Mr. Leipham informed petitioner that he was seeking someone with a background similar to that of petitioner to train to be the future manager of the business. Petitioner and Mr. Leipham engaged in several further discussions concerning the prospect of petitioner becoming a part of the business. Mr. Leipham invited petitioner to his home on several occasions to have dinner with him and his wife. At one of these dinners, Mr. Leipham explained that he was president of the corporation, that his wife was secretary-treasurer and that there were other individuals who were shareholders and directors of the corporation. One of the individuals that Mr. Leipham represented to be a director of Finders was said to be a prestigious banker and another was said to be the corporate attorney. At a subsequent dinner meeting Mr. Leipham offered to sell petitioner 15 percent of the corporation for the sum of $10,000. He also told petitioner that he would teach petitioner the business *269 of being a broker so that eventually when he retired he could turn control of the business over to petitioner. Mr. Leipham then showed petitioner a number of letters from other brokers and individuals indicating that several transactions were being negotiated, which if consummated would involve substantial commissions for Finders. At a subsequent meeting Mr. Leipham increased the offer from 15 percent to 20 percent of the stock of Finders for the amount of $10,000. Petitioner was told that the reason the offer was increased was because Mr. Leipham and his wife had been very favorably impressed by petitioner.Mr. Leipham also represented to petitioner that he was a millionaire. Petitioner asked to see financial statements of Mr. Leipham and annual financial statements and other records of Finders. Petitioner was advised that information had been given to the accountant for the purpose of having the accountant prepare current statements, but that these statements had not been completed. Petitioner and Mr. Leipham then worked out details of the training which petitioner would receive and also agreed that petitioner would receive a salary from Finders equal to the salary he had *270 been earning as an engineer. At these meetings it was represented to petitioner that he would be treated as a "partner." In June 1967, petitioner gave Mr. Leipham a check in the amount of $5,000 made payable to Finders. At this time Mr. Leipham gave petitioner a memorandum in which he agreed to a period of 60 days in which the money invested would be returned if either party became dissatisfied. The memorandum also provided that petitioner had the privilege of buying additional shares of Finders in the future and that petitioner could pay for the additional shares out of petitioner's share of commissions that would be earned in the future. In September 1967, petitioner gave Mr. Leipham a second check in the amount of $5,000 made payable to Finders. The proceeds of both checks were deposited in a corporate bank account. After tendering the second check, petitioner received a stock certificate representing 40 shares (20 percent) of the authorized shares of stock of Finders. Although petitioner again requested to see the books and records of Finders, he was advised by Mr. Leipham that the accountant was still in the process of preparing the updated financial statements. Mr. *271 Leipham had promised to make these records available to petitioner as soon as the total payment was made. Petitioner began to make daily visits to the offices of Finders, which were located in Rochester, New York. At the office petitioner usually performed research on various business matters. In September 1967, petitioner was introduced in a brief meeting to the individual Mr. Leipham represented to be the corporate attorney and a director of Finders. Shortly thereafter, Mr. Leipham and petitioner had a luncheon meeting with the individual that had been represented to petitioner by Leipham to be the prestigious banker who also was a director of Finders. At this luncheon, no discussion arose which indicated whether this individual was or was not, in fact, a director. However, Mr. Leipham explained to petitioner that this individual would be instrumental in financial matters. In January or February 1968, Mr. Leipham informed petitioner that he was on the verge of closing a multi-million dollar transaction and advised petitioner that it would be an opportune time to exercise his option under the memorandum to obtain additional shares of Finders. Petitioner was informed that *272 because he had made such a favorable impression he could obtain an additional 30 percent of the corporation for the sum of $6,000 and that he could pay for the shares out of his share of the earnings. Petitioner then executed a promissory note in the amount of $6,000 with the understanding that the note was to be paid from his share of the earnings. It was also agreed that the certificates were not to be issued for this additional stock until the money was actually paid. At approximately this time petitioner was shown a financial statement by Mr. Leipham which represented Mr. Leipham's net worth to be approximately $1.6 million. At some time after September 1968, the business offices of Finders in Rochester were closed by Mr. Leipham and moved by him to his home in Conesus, New York. This move required petitioner to travel approximately 30 to 40 miles farther to visit the business premises. Also, at this time Mr. Leipham began to travel extensively and petitioner's contacts with him became less frequent. However, petitioner remained in contact with Mrs. Leipham and was assured by her each time he telephoned her that Mr. Leipham was very near to closing a large deal. Petitioner *273 also received a number of post cards mailed by Mr. Leipham from various locations. The messages written on these cards were to the effect that Mr. Leipham was striving for business for the corporation and that progress was being made toward finalizing various transactions. By the spring of 1970 petitioner had become very concerned about the prospect of the business of Finders. Mr. Leipham was constantly out of town and petitioner was unable to contact him. At this time petitioner began to suspect that he had been defrauded by Mr. Leipham. Petitioner visited the individual who Mr. Leipham had represented to be the corporate attorney in an attempt to ascertain the whereabouts of Mr. Leipham. Petitioner was advised by this attorney that he was not legal counsel for the corporation and did not know the whereabouts of Mr. Leipham. Petitioner was informed in his conversation with the attorney that Mr. Leipham had been adjudicated a bankrupt. Petitioner then obtained the bankruptcy file under Mr. Leipham's name. This file showed that an involuntary petition in bankruptcy had been filed by one of Mr. Leipham's creditors in 1962 and in 1968 Mr. Leipham had been adjudicated a bankrupt. *274 Petitioner also found information in the bankruptcy file in Mr. Leipham's case showing Mr. Leipham's assets to be approximately $3,000 and his liabilities approximately $340,000. At this point petitioner concluded that he had been swindled into making the investment in Finders. Petitioner next contacted the banker who Mr. Leipham had represented to be a member of the board of directors of Finders. Petitioner was advised by this individual that he did not know the whereabouts of Mr. Leipham. Petitioner also had conversations with one of the builders from California who had been introduced to him by Mr. Leipham. This individual told petitioner that Mr. Leipham often stayed with him while on trips to the west coast and that Mr. Leipham had characterized petitioner as a fool for investing in Finders. This individual told petitioner that Mr. Leipham had stated he never intended to treat petitioner as a business partner. This individual told petitioner that Mr. Leipham had received large brokerage fees and that he thought Mr. Leipham had moved to Mexico City.
Petitioner filed a complaint with the local police in Rochester, New York. He also filed a complaint with the Rochester *275 office of the New York State Attorney General. During 1970 petitioner received no information of Mr. Leipham's whereabouts from either of these sources although an investigation to locate Mr. Leipham was undertaken by both. During 1970 and thereafter petitioner checked telephone directories for Mexico City and also had correspondence with the equivalent of a Chamber of Commerce in Mexico City to ascertain whether Finders was doing business there, but he was not successful in locating Mr. Leipham. In 1970 petitioner did not check with the United States Postal Service to determine if Mr. Leipham had left a forwarding address. In April 1971 petitioner filed his individual income tax return for 1970 claiming a theft loss deduction of $10,000. At this time he also filed an "Application for Tentative Refund from Carryback of Net Operating Loss or Unused Investment Credit," carrying back the net operating loss shown on his 1970 return to 1967. In 1974 a friend of petitioner's suggested that petitioner check with the postmaster in Rochester, New York to see if perhaps Mr. Leipham had left a forwarding address. Petitioner then wrote the postmaster requesting such information and *276 was advised that postal service records at Rochester reflected a Clearwater, Florida forwarding address for Mr. Leipham. Petitioner then instituted a civil action against Mr. Leipham and his wife, Hilda, in the United States District Court, Eastern District of New York (Docket Number 74C220). The suit contained 4 counts, one of which sought recovery of the $10,000 sum advanced by petitioner to Mr. Leipham in 1967. Petitioner's amended complaint alleged that he was fraudulently induced to make the investment by a knowing misrepresentation of material facts by Mr. Leipham. On April 28, 1976, a default judgment on the count seeking recovery of the $10,000 was entered in the suit against Mr. Leipham. Petitioner instituted these proceedings for the purpose of recovery of the money he had invested in Finders. Petitioner believes that Mr. Leipham has assets, but as of the date of the trial in this case in late May 1976 had not attempted to execute on the judgment. In 1975 petitioner wrote to the New York State Department of Taxation to obtain information with respect to Finders. He was advised that Finders had been dissolved by proclamation of the State of New York on December 31, 1968. *277 For the years 1967 and 1968, Finders filed corporate Federal income tax returns reporting gross receipts of $3,860.50 and $10,550, respectively, from the business of being a broker. These returns showed net losses of $14,586.82 and $1,581, respectively. During the years 1967 and 1968 Mr. Leipham corresponded with several persons with respect to Finders acting as broker. The check stubs of the Finders' account in which the checks from petitioner were deposited carried notations showing that checks were drawn for items such as stationery, telephone bills, advertising, travel expenses, telegrams and telex fees. Petitioner never received a salary or any dividends from Finders. Also Finders never held a shareholders meeting. On petitioner's return for 1970 a $10,000 theft loss was claimed. Petitioner's deductions, including this theft loss deduction, for 1970 exceeded his income. On April 15, 1971, petitioner filed a Form 1045, Application for Tentative Refund from Carryback of Net Operating Loss or Unused Investment Credit, claiming a net operating loss arising out of the theft loss discovered in 1970. A refund based upon this amount was made. In his statutory notice of *278 deficiency, respondent disallowed the deduction with the following explanation: The deduction of $10,000.00 claimed as a casualty loss resulting from a criminal appropriation is not allowed because you have failed to establish that any criminal appropriation has taken place; therefore, it is determined that you did not sustain a net operating loss in the taxable year 1970 within the meaning of section 172 of the Internal Revenue Code. Consequently, there is no net operating loss carryback to prior years, i.e. 1967, and no net operating loss carryover to subsequent years.
OPINION Section 165(c)(3)[2] allows a deduction for the loss of property sustained by a taxpayer as a result of theft. Section 165(e) provides that the deduction for such loss is allowed in the taxable year in which the taxpayer discovers the loss. *279 It is petitioner's position that he was induced to invest in Finders as a result of fraudulent misrepresentations made to him by Mr. Leipham with the result that he sustained a theft loss in 1970, the year in which he became aware that he had been defrauded. It is respondent's position that petitioner is not entitled to a theft loss deduction in 1970 and the resulting carryback to 1967 for several reasons.Respondent's principal contention is that under the facts presented in this case there was no theft from petitioner. In addition, respondent contends that if there was any theft by Mr. Leipham such theft was from the corporation as Finders became the owner of the money once the checks were deposited to the corporate account. Respondent also contends that there is no evidence in the record to demonstrate the amount of the funds alleged to have been appropriated by Mr. Leipham if a theft occurred. Finally, respondent contends that no deductible loss was sustained in 1970 because the record does not disclose that there was no reasonable prospect of recovery in 1970 and also that petitioner should have reasonably discovered the loss prior to 1970. *280 In order to show that a theft of property occurred within the meaning of section 165, a taxpayer must establish that his loss of such property resulted from theft under the law of the jurisdiction where the transaction resulting in the loss occurred. Monteleone v. Commissioner,34 T.C. 688, 692 (1960). However, there is no requirement that the person claimed to have perpetrated the theft have been convicted of theft for a theft loss deduction to be allowable. Vietzke v. Commissioner,37 T.C. 504, 510 (1961). Section 155.05 of the New York Penal Law (McKinney's Consolidated Laws of New York, 1975) provides that the taking of money by false representations or false pretenses constitutes theft. [3]
In People v. Lehrer,45 N.Y.S.2d 170, 172 (N.Y. County Ct. of Gen. Sess. 1943), the court listed the elements of grand larceny by false pretenses as follows: To constitute the crime of grand larceny by false pretenses, five elements must be established: (1) that there was a criminal intent to *281 deprive and defraud the owner of her property (2) that the defendant made a false representation of a past or existing fact (3) that he knew that the representation was false (4) that he obtained the property and (5) that the person to whom the representation was made relied upon that representation and was in whole or in part influenced thereby to give her property to the defendant; in other words, that the representation in whole or in part was the inducing cause of the complainant parting with her money. *282 In People v. Von Brandenburg,241 N.Y. 128, 149 N.E. 221 (1925), the court stated that if stock were purchased and the purchaser was induced to buy the stock by reason of false representations made to him, the crime of larceny is proved since the "folly [of the purchaser] in relying on such representations is no defense." It is petitioner's position that he was induced to make the investment in Finders by delivering 2 checks, each in the amount of $5,000, by the misrepresentations and false promises of Mr. Leipham, the president of Finders. According to petitioner these representations include (1) the oral statements of Mr. Leipham that he was a millionaire, when in fact he was involved in bankruptcy proceedings; (2) correspondence shown to petitioner by Mr. Leipham indicating multimillion dollar transactions arranged by Finders were very near to consummation when in fact such transactions were not near or likely of consummation; (3) promises by Mr. Leipham to supply all books and records of the company which were represented to be in the hands of the accountant, which books and records were never provided; (4) promises by Mr. Leipham that petitioner would be *283 paid a salary equal to the amount he was earning as an engineer, which salary was never paid and which Mr. Leipham never intended to be paid; and (5) promises by Mr. Leipham to treat petitioner as a legitimate business partner, which was never done and which Mr. Leipham never intended to do as shown by the fact that business meetings were never held, books and records were never provided for petitioner's information and keys to the office and filing cabinets were not provided for petitioner's use.
We need not determine the exact nature of the crime under the larceny provisions of New York law so long as we conclude that petitioner was parted from his money by trick or deceit. Vietzke v. Commissioner (37 T.C. at 511). In Edwards v. Bromberg,232 F.2d 107, 111 (5th Cir. 1956), the court stated "that the exact nature of the crime, whether larceny or embezzlement, for obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft." The term as used in section *284 165(c)(3) is broadly defined: [The] word "theft" is not like "larceny", a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile. [Edwards v. Bromberg,supra at 110; fn. omitted; emphasis added.] [4]
In our view the representations made to petitioner by Mr. Leipham were false and promises made to petitioner by Mr. Leipham were not fulfilled and Mr. Leipham did not intend to fulfill these promises when he made them. Based upon the evidence before us, we conclude that petitioner parted with the $10,000 in 1967 under circumstances amounting to a criminal misappropriation constituting larceny under New York law. [5]
*285 Respondent argues that petitioner has failed to show a theft in that he has failed to show that the money was appropriated by Mr. Leipham to his own use. Respondent points out that the proceeds of the checks given by petitioner were deposited in the corporate account and argues that the funds were used mostly to pay corporate travel and communication expenses. While it is clear that the proceeds of the checks were placed in the corporate account, the evidence indicates that Mr. Leipham did in fact use the proceeds in his sole discretion. A joint exhibit submitted into evidence consisted of the check stubs of a corporate account maintained by Finders at a local bank in Rochester. Some of the memoranda placed upon the stubs and the payees noted are consistent with respondent's assertion that amounts were paid by check for usual and necessary business expenses for a corporation in the trade or business of Finders.Many of the notations, such as travel or telephone, indicate uses of funds by Mr. Leipham. Since Mr. Leipham used the funds of Finders in his sole discretion, the notations on check stubs are not indicative of a corporate use of the funds and other evidence indicates a *286 personal use by Mr. Leipham. None of the checks written on this account were offered into evidence and the check stubs covered only a period of approximately 2 months subsequent to the deposit of the second $5,000 check of petitioner's to Finders account. These check stubs do not show the purpose for which the funds paid by petitioner were used or overcome other evidence of Mr. Leipham's usage of the funds deposited in the corporate account.The fact that Mr. Leipham was involved in a bankruptcy proceeding is indicative of a reason he may have chosen a corporate account as a depository of funds he would use in travel and for other purposes. In our view, the crucial fact was the representations made by Mr. Leipham which caused petitioner to part with his funds by writing 2 checks totaling $10,000 payable to Finders. The evidence shows when Mr. Leipham induced petitioner to part with the $10,000 he did not intend to treat petitioner as a shareholder, and that he intended to use the funds as he saw fit. Further, in our view, the evidence indicates that if Mr. Leipham had been successful in making Finders profitable, petitioner would not have been apprised of that fact and would not *287 have received any of the profits. Although it is apparent that at the date of petitioner's investment in Finders it was a corporation qualified to do business and was in all likelihood performing some business as a broker, we do not consider that the separate entity of Finders would prevent petitioner's loss from being from theft since Mr. Leipham had full control of the $10,000.The inducement of petitioner by Mr. Leipham by false promises to invest his money in Finders is the operative fact. Petitioner was induced to part with $10,000 with representations by Mr. Leipham which were false and promises which Mr. Leipham did not intend to carry out. Mr. Leipham never intended to return the $10,000 to petitioner or cause the amount to be returned to him or to have petitioner receive a salary or profits from Finders. Mr. Leipham's representations to petitioner were much more than mere statements of a fantastic business potential. This case is therefore distinguishable from Bellis v. Commissioner,61 T.C. 354 (1973). Our determination that the misappropriation occurred upon the inducement to invest makes it unnecessary to address respondent's contention that if there *288 was a theft it was of corporate property rather than of petitioner's property and that there is no evidence to support the amount of the misappropriation. Respondent's final contention is that petitioner is not entitled to deduct a theft loss in 1970 because petitioner has failed to show that at the close of the taxable year there was no reasonable prospect of recovery. Section 1.165-1(d)(3), Income Tax Regs., [6] provides that any loss arising as the result of a theft shall be treated as sustained in the taxable year in which the loss is discovered.The regulation further provides that if in the year of discovery "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received." We have previously held this regulation to be valid. Ramsay Scarlett & Co., Inc. v. Commissioner,61 T.C. 795 (1974). *289 In that case we stated (at 811-812): A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. Scofield's Estate v. Commissioner, 266 F.2d at 159; Foundation Co., 14 T.C. at 1351, 1354. The standard for making this determination is an objective one, under which this Court must determine what was a "reasonable expectation" as of the close of the taxable year for which the deduction is claimed. Scofield's Estate v. Commissioner,supra at 163; Parmelee Transportation Co. v. United States,351 F.2d 619, 628 (Ct. Cl. 1965). * * * The standard is to be applied by foresight, and hence, we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year. Nor does the fact of a future settlement or favorable judicial action on the claim control our determination, if we find that as *290 of the close of the particular year, no reasonable prospect of recovery existed. Cf. Rainbow Inn, Inc. v. Commissioner,433 F.2d 640, 644 (C.A. 3, 1970.)
Respondent's argument with respect to the question of whether there was a reasonable prospect of recovery at the close of 1970 is two-fold. Respondent argues that it is not clear from the record that petitioner could not have recovered in 1970 *291 since he made no real effort to do so. Therefore, under respondent's argument, there being no showing that any reasonable expectation of recouping the loss had expired in 1970, the deduction in 1970 should be denied. Respondent contends that petitioner did not adequately pursue his claims against Mr. Leipham basing his argument on the fact that petitioner did not contact the United States Post Office in 1970 to determine if Mr. Leipham had left a forwarding address. Even though, when petitioner checked with the postal officials in 1974, he was advised that there was available a forwarding address for Mr. Leipham, the record shows that petitioner was unaware in 1970 of being able to obtain such information from the Post Office, and further shows that the information he had obtained in 1970 indicated that Mr. Leipham was in Mexico. Petitioner argues that he made a reasonable effort to pursue his claim against Mr. Leipham in 1970. He points out that in 1970 he contacted all of the business associates of Mr. Leipham that he was aware of and that none of these individuals knew the whereabouts of Mr. Leipham, except for the builder in California who advised petitioner that he thought *292 Mr. Leipham had moved to Mexico City. [7] Petitioner also contacted the New York State Attorney General's office and the local authorities in Rochester seeking assistance in locating Mr. Leipham. Petitioner also attempted on his own to locate Mr. Leipham by contacting a business association in Mexico City to determine if Finders was doing business there, and checked the Mexico City telephone directory to determine if Mr. Leipham or Finders had obtained a listing. In our view petitioner's unsuccessful search for Mr. Leipham in 1970 was sufficient to justify his concluding that at the end of the year 1970 there was no reasonable prospect of recovery of the sum he had invested in Finders. Without being able to ascertain the location of Mr. Leipham, there was no place to effectuate service of process if petitioner had attempted to seek reimbursement by civil action. Respondent's alternative approach is that a claim against *293 Mr. Leipham had not expired in 1970 because petitioner obtained a default judgment in 1976 in the Federal District Court for the Eastern District of New York from a suit filed in 1975 for the $10,000 advance to Finders in 1967. At the date of trial of the case before us, petitioner had not attempted to execute on the default judgment obtained approximately one month prior to the trial. Petitioner's testimony was that he has reason to believe that Mr. Leipham has assets. Therefore, respondent apparently contends that because petitioner was able to locate Mr. Leipham in 1974 by obtaining a forwarding address from the postal service, there was a reasonable prospect of recovery at the close of 1970. The fact that petitioner has obtained a default judgment in 1976 against Mr. Leipham does not prevent the theft loss deduction in 1970. The relevant inquiry is to the facts in existence at the close of 1970. Ramsay Scarlett & Co., Inc. v. Commissioner,supra at 811. The fact that petitioner would ultimately be able to locate Mr. Leipham was not reasonably foreseeable at the end of 1970. Based upon the evidence before us, we conclude that there remained no reasonable *294 prospect of petitioner's recovery of the $10,000 at the close of 1970. At that time there was no indication that petitioner would be able to locate Mr. Leipham and the indication was that if Mr. Leipham could be located he would have no assets upon which petitioner could execute after obtaining a judgment. Respondent also argued that petitioner suffered no theft loss in 1970 because it is beyond belief that petitioner would not have discovered something was amiss prior to 1970. Respondent bases his argument on the fact that petitioner's testimony indicated he worked several hours per week at Finders for a period of 2-1/2 years, that petitioner had not seen Mr. Leipham during 1969, and the fact that petitioner was a highly educated individual. A loss is considered to be discovered when a reasonable man in similar circumstances would have realized the fact that he had suffered a theft loss. Cramer v. Commissioner,55 T.C. 1125, 1133 (1971). All during the period prior to petitioner's conclusion that he had been swindled into making the investment he was continually placated *295 by stories of large transactions near to completion and prospective deals to follow.Petitioner did not have access to the information contained in the books and records of Finders or other matters of Finders. While some persons might have become suspicious of Mr. Leipham sooner than petitioner did, in our view "a reasonable man" under similar conditions would not necessarily have realized at an earlier date that he had been swindled. No particular facts are shown in the record which would suggest that any specific happening should have caused petitioner to discover the theft loss earlier than 1970. We hold that petitioner is entitled to deduct the amount of $10,000 as a theft loss in 1970 and therefore is entitled to carry back the net operating loss created thereby to the year 1967. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such an individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return. * * *
(e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
3. New York Penal Law, sec. 155.05(1) and (2) (McKinney's Consolidated Laws of New York, 1975), provides: 1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof. 2. Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: (a) By conduct heretofore defined or known as common law larceny by trespassory taking, common law larceny by trick, embezzlement, or obtaining property by false pretenses; * * *
(d) By false promise. A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or, as the case may be, does not believe that the third person intends to engage in such conduct. In any prosecution for larceny based upon a false promise, the defendant's intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed. Such a finding may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant's intention or belief that the promise would not be performed;↩
4. Sec. 1.165-8(d), Income Tax Regs., provides: (d) Definition. For purposes of this section the term "theft" shall be deemed to include, but shall not necessarily be limited to, larceny, embezzlement, and robbery.↩
5. Just prior to trial of this case, petitioner filed a motion entitled Motion for Summary Judgment. In this motion, petitioner asserted that the default judgment obtained against Mr. Leipham satisfied his burden of proof in this case in that the judgment established a theft from petitioner by Mr. Leipham.Action in petitioner's motion was deferred. Since we have determined on the basis of the evidence that there was a theft, we need not rule on this motion.↩
6. Sec. 1.165-1 [Income Tax Regs.] Losses. * * *
(d) Year of deduction. * * * (3) Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see sec. 1.165-8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165↩, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.
7. Although there is no competent evidence in the record to establish the actual location of Mr. Leipham at the end of 1970, it is clear that the record supports the conclusion that Mr. Leipham was attempting to secret himself from petitioner and others.↩