# United States Tax Court

T.C. Memo. 2025-108

CRAIG K. POTTS AND KRISTEN H. POTTS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 14941-18.                     Filed October 16, 2025.

————

*John S. Jagiela*, for petitioners.

*Ashleigh R. Wise Friedman, Colin M. Mierau*, and *Rachael J. Zepeda*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, *Judge*: With respect to petitioners' federal income tax for 2014, the Internal Revenue Service (IRS or respondent) determined a deficiency of $431,691 and an accuracy-related penalty of $86,338 pursuant to section 6662(a).[1] The deficiency and penalty are predominantly attributable to the disallowance of a theft loss deduction claimed under section 165. After concessions, this is the main dispute between the parties that we must resolve.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[*2]                          FINDINGS OF FACT

The facts we find are derived from the pleadings, the trial testimony, and the documents admitted into evidence and include the stipulated facts and documents. Petitioners resided in Arizona when they timely filed their Petition.

I.     *Petitioners' background and involvement in the Turks and Caicos Islands*

   A.     *Background*

Craig Potts started his career providing check cashing services to Native American casinos. He expanded the business to provide cash management services, including ATMs and cash advances, to casinos across the United States, as well as gaming establishments in 23 countries.

   B.     *First investments in the Turks and Caicos Islands*

In 2001 petitioners made their first investment in the Turks and Caicos Islands (Turks and Caicos), purchasing Carib West, a beer distributor. They subsequently purchased Danny Buoy's, a Turks and Caicos bar that had slot machines. Petitioners did not own the slot machines; instead, under a routing agreement, Carib Gaming, Ltd. (Carib Gaming), owned and maintained the machines. Petitioners, as owners of Danny Buoy's, were entitled to a percentage of the machines' net revenue.

   C.     *Carib Gaming and Jack Tatum*

Mr. Potts met Jack Tatum through the Danny Buoy's routing agreement. Mr. Tatum was the general manager of Carib Gaming. He and another investor, Rick Olson, were majority owners of VT Enterprises, Ltd. (VT Enterprises), which owned 75 shares of Carib Gaming. Another entity, Turquoise Development Co. (Turquoise Development), held the remaining 25 shares of Carib Gaming.

Carib Gaming was an established slot router in the Turks and Caicos, holding the requisite license to operate slot machines in multiple locations. It was the router for 92 slot machines in 27 establishments.

As a router, Carib Gaming entered into agreements with bars and other establishments to operate slot machines. Carib Gaming provided

**[*3]** and maintained the machines. Its employees periodically collected the net revenue from each machine. Carib Gaming was responsible for the associated gaming taxes, including monthly inspections by the Turks and Caicos Gaming Commission of each machine to verify the correct reporting of each machine's net revenue for tax purposes. Pursuant to a routing agreement, Carib Gaming remitted an agreed-upon percentage of the net revenue, less gaming taxes, to the establishment owner.

In addition to the slot routing business, Carib Gaming operated the digital casino Player's Club until 2008.[2] It had 50 slot machines in Player's Club. In 2007 Carib Gaming recorded $20,913,449 in gross revenue.

II.     *Petitioners' purchase of Carib Gaming shares*

While initially sporadic, conversations between Messrs. Potts and Tatum became more frequent as petitioners acquired additional gaming establishments in the Turks and Caicos, some of which used Carib Gaming as their router.

Relevant to the issue we must decide, Mr. Tatum approached Mr. Potts with an opportunity to invest in Carib Gaming. Mr. Tatum described a project to build a casino (casino project) in the Airport Hotel & Plaza (Airport Hotel). The Airport Hotel, owned by Hayden and Lillian Boyce, leased to Carib Gaming space on the hotel property for the casino.

Carib Gaming had begun extensive renovations to the existing space, including excavating the floor to increase the interior's ceiling height. At some point Mr. Tatum suggested to the Boyces that the casino would feature a historic neon sign from Fitzgeralds, a former Las Vegas casino. As part of the investment proposal, Mr. Tatum flew Mr. Potts and Mr. Olson to the Turks and Caicos to visit the property and discuss the casino project.

---

[2] Player's Club had a physical location; it was called a digital casino because games (e.g., blackjack or roulette) were played using screens and buttons. In blackjack, for example, the cards were dealt digitally on a screen, but a dealer was responsible for pressing a button to "hit" or "stand" for the player.

[*4]   A.   *Memorandum of Understanding*

In April 2008 petitioners entered into a Memorandum of Understanding (MOU) to purchase shares of Carib Gaming from existing investors. The MOU stated that petitioners would purchase 25 shares or 25% of Carib Gaming's issued and outstanding shares, for $2,500,000, with an option to purchase an additional 8% for $800,000 within one year after the payment of the purchase price.

The MOU required petitioners to pay a $250,000 deposit to the seller's attorney. The MOU further stated that petitioners would purchase a 10% interest in "a business known as 'Slots of Fun' to be established on Airport Road," for $250,000. The $250,000 was to be credited towards the Carib Gaming purchase price if the transaction was completed. The MOU did not otherwise specify how the purchase price would be used by the sellers. The MOU bears Mr. Tatum's signature dated April 24, 2008, and appears to bear Mr. Potts's initials. Mr. Tatum provided petitioners unaudited financial statements for Carib Gaming, including an asset report; these are attached to the copy of the MOU that is in the record.

On April 24, 2008, petitioners wired the $250,000 deposit to the client account of VT Enterprises' counsel, the law firm Swann Trowbridge McKnight.

B.   *Share Purchase Agreement*

On May 27, 2008, Kristen Potts entered into a Share Purchase Agreement (2008 Purchase Agreement) with VT Enterprises. Petitioners were represented by counsel, who drafted the 2008 Purchase Agreement. Swann Trowbridge McKnight again represented VT Enterprises.

Pursuant to the 2008 Purchase Agreement, Mrs. Potts purchased 25 shares of Carib Gaming from VT Enterprises for $2,500,000. The 2008 Purchase Agreement provided that if the purchase was terminated for any reason other than lack of regulatory approval, the $250,000 deposit would be treated as a purchase of a 10% interest in Mancurian Holdings, Ltd., a wholly owned subsidiary of Carib Gaming. It defined the prospective interest in Mancurian Holdings, Ltd., as the "Slots of Fun Shares."

The 2008 Purchase Agreement stated it "represent[ed] the only agreement among the parties . . . and supersede[d] all prior agreements

[*5] whether written or oral" not attached or referenced within the Agreement. Like the MOU, the 2008 Purchase Agreement did not specify how VT Enterprises would use the $2,500,000.

Petitioners, through a registration agent, incorporated CGL Investments, Ltd. (CGL), in the Turks and Caicos on May 16, 2008. Mrs. Potts owned all issued CGL shares. By amendment to the 2008 Purchase Agreement dated May 27, 2008, CGL, as designee of Mrs. Potts, purchased the 25 shares. On June 2, 2008, Mr. Potts wired the remaining $2,250,000 to the Swann Trowbridge McKnight trust account.

Following the execution of the 2008 Purchase Agreement, VT Enterprises acquired five shares of Carib Gaming from Turquoise Development; VT Enterprises then owned 55 shares, CGL 25 shares, and Turquoise Development 20 shares.

C. *Shareholder Agreement*

On August 5, 2008, Carib Gaming, VT Enterprises, CGL, and Turquoise Development entered into a Shareholder Agreement. The Shareholder Agreement authorized each shareholder to designate a director to Carib Gaming's board, so long as the shareholders maintained or exceeded their current ownership interests. Shareholders had the right to inspect and make copies of Carib Gaming's books and records, call special board meetings, and visit its facilities. The Shareholder Agreement granted existing shareholders the right to purchase additional shares to maintain their relative ownership percentage and avoid dilution upon a proposed issuance of new shares in Carib Gaming. It also provided that the Shareholder Agreement and the 2008 Purchase Agreement superseded all prior agreements concerning shareholder rights.

III. *Carib Gaming 2008 to 2014*

A. *Petitioners' income from Carib Gaming*

Petitioners received dividends from Carib Gaming on account of their ownership on ten different occasions. They separately received distributions from Carib Gaming on account of Carib Gaming's routing agreements with petitioners' other gambling establishments (e.g., Danny Buoy's).

[*6]    On personal financial statements for 2009 and 2010, petitioners listed $500,000 and $200,000 of income from Carib Gaming, respectively. The statements also valued their interest in Carib Gaming at $6 million.

### B.    *Petitioners' contact with Mr. Tatum*

After the 2008 purchase Messrs. Potts and Tatum continued to communicate, primarily about Carib Gaming's financials and the status of the casino project. Petitioners and Mr. Tatum remained in communication until 2014.

### C.    *Status of the casino project*

Construction on the casino did not progress beyond the partial demolition of the Airport Hotel space. It remained in this partially demolished state as of the date of trial.

### D.    *Carib Gaming's unpaid gaming taxes*

At some point in 2014 Mr. Potts became aware that Carib Gaming had failed to remit certain gaming taxes to the Turks and Caicos authorities. Carib Gaming also owed ongoing rent to the Boyces for the Airport Hotel space.

## IV.    *Elite Gaming*

Separately from the Carib Gaming investment, petitioners through a registration agent incorporated Elite Gaming, Ltd. (Elite Gaming), in 2009. Petitioners subsequently transferred all issued Elite Gaming shares to CGL. Elite Gaming owned and operated the Downtown Slot Parlour in the Turks and Caicos. It also operated several slot routes for various restaurants and bars in the Turks and Caicos.

## V.    *2014 Purchase Agreement*

In 2014 CGL and VT Enterprises entered into a Share Purchase Agreement (2014 Purchase Agreement). CGL acquired VT Enterprises' 52 remaining Carib Gaming shares for $225,000.[3] The 2014 Purchase

---

[3] Following the 2008 Purchase Agreement VT Enterprises owned 55 of the 100 outstanding Carib Gaming shares, but in 2014 it owned 52 of the 98 outstanding shares. This discrepancy is not explained in the record but ultimately is not relevant to our analysis. In 2014 the Carib Gaming shares held by Turquoise Development were subject to a confiscation order.

[*7] Agreement required an immediate deposit of $50,000, followed by 15 monthly installments of $11,660. Petitioners also executed a Joint and Several Continuing Guarantee Agreement, rendering Elite Gaming jointly and severally liable for the installment payments.

Peter Karam, a Turks and Caicos attorney, represented petitioners and CGL in connection with the 2014 Purchase Agreement, and Brian Trowbridge (formerly of Swann Trowbridge McKnight) represented Messrs. Tatum and Olson and VT Enterprises.

As part of the transaction, the parties entered into a Deed of Settlement and Release, under which CGL released Messrs. Tatum and Olson of "all claims of any nature whatsoever arising out of or in relation to the business operations of Carib [Gaming]," for nominal consideration. Petitioners never filed a civil suit against VT Enterprises or Messrs. Tatum and Olson.

VI.   *2014 return and examination*

McGladrey, LLP,[4] prepared, and petitioners timely filed, their 2014 federal income tax return. Petitioners claimed a $2 million theft loss deduction pursuant to section 165 and reported no federal income tax liability.[5]

On May 7, 2018, the IRS mailed petitioners a Notice of Deficiency for tax year 2014, disallowing the theft loss deduction, making other adjustments not at issue in this case, and determining an accuracy-related penalty pursuant to section 6662 for negligence or, alternatively, a substantial understatement of tax. The record includes a Civil Penalty Approval Form signed by a group manager.

OPINION

I.   *Evidentiary issue*

We confronted a number of evidentiary disputes before, during, and after trial, partly as a consequence of the age of this case.

---

[4] McGladrey now does business as RSM US, LLP.

[5] Petitioners reported a self-employment income tax liability pursuant to section 1401.

**[\*8]**   A.    *Second and Third Supplemental Stipulations of Facts*

Before trial respondent filed Motions for Order to Show Cause Why Proposed Facts and Evidence Should Not be Accepted as Established Pursuant to Rule 91(f), as to the proposed Second and Third Supplemental Stipulations of Facts. Petitioners filed Responses, stating that they were amenable to stipulating most Exhibits, but objecting to others on grounds of hearsay, incompleteness, and failure to redact sensitive personal information. Petitioners also sought to reserve their objection if they later discovered errors within the bank records in the Second Supplemental Stipulation of Facts.

At trial we admitted the Exhibits in the Second and Third Supplemental Stipulations of Facts, subject to certain qualifications. We indicated that we would deny respondent's Motions as moot if the parties filed signed copies of the Stipulations following trial. Because the parties did just that, we will deny his Motions as moot.

B.    *Exhibits 86-R and 1048-R*

Some issues were resolved at trial, and we ordered memorandum briefs on the remaining ones. On June 5, 2024, we entered an Order addressing those issues that invited the parties to address the admissibility of Exhibits 86-R and 1048-R (namely the existence of an agency relationship) in their posttrial briefs.

Exhibit 1048-R is an email exchange among Victoria Spencer, Gary Mead, and Chris Domijan, on which petitioners were copied. Ms. Spencer was a senior tax manager at McGladrey. Mr. Mead was the general manager of Elite Gaming. Mr. Mead also took effective operational control of Carib Gaming following petitioners' purchase of a controlling interest in 2014. Mr. Domijan was a paid consultant serving as the acting CFO of Elite Gaming. In the exchange, Ms. Spencer asked Mr. Mead for information about petitioners' Turks and Caicos entities and Mr. Mead directed her to Mr. Domijan. Exhibit 86-R is an email exchange between Ms. Spencer and Mr. Domijan that petitioners also were copied on, in which the two discussed the financials of petitioners' Turks and Caicos entities.

Petitioners object to both Exhibits on hearsay grounds. Respondent counters that the statements in both Exhibits are not hearsay because they are admissions by the opposing party's agents or employees.

**[\*9]** Under Rule 801(d)(2)(D) of the Federal Rules of Evidence, a statement is not hearsay and may be admitted against an opposing party if the statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To resolve this dispute, "we must 'undertake a fact-based inquiry applying common law principles of agency.'" *United States v. Bonds*, 608 F.3d 495, 504 (9th Cir. 2010) (quoting *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1096 (9th Cir. 2008)). The proffering party must "lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment." *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995)).

Neither party in the posttrial briefs meaningfully expanded upon whether an agency or employment relationship existed with respect to Mr. Mead and Mr. Domijan. Respondent cited Exhibit 86-R in support of his determination of negligence for the purposes of section 6662(a) and (c).

We first consider Exhibit 86-R. Mr. Domijan was a paid consultant serving as the acting CFO of Elite Gaming. Petitioners contend that respondent failed to lay a foundation to show the exclusion applies. We agree. Aside from Mr. Domijan's title, the record is bare as to the details of the consulting arrangement. We are unable to engage in the necessary "fact-based inquiry applying common law principles of agency," and therefore we exclude Exhibit 86-R. *See Bonds*, 608 F.3d at 504.

In posttrial briefing neither party relied on Exhibit 1048-R. We surmise that the primary purpose of Exhibit 1048-R was to establish the admissibility of Exhibit 86-R. While it is not material to our analysis, we nevertheless will address its admissibility.

Petitioners do not dispute that an employment relationship existed with Mr. Mead. Instead, they contend that Mr. Mead's referral of McGladrey's requests to Mr. Domijan was outside the scope of Mr. Mead's duties.

That Mr. Mead was not personally responsible for the financial management of petitioners' Turks and Caicos entities does not support a conclusion that the referral was outside the scope of Mr. Mead's employment. "[A] matter may fall within the scope of a declarant's

**[\*10]** employment even though the declarant did not have final decision-making authority on that matter." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999 (9th Cir. 2019). Mr. Mead evidently was a point of contact for Ms. Spencer as she prepared petitioners' federal income tax returns. She inquired about the financial information for petitioners' Turks and Caicos entities. Mr. Mead, as general manager of Elite Gaming, directed her to Elite Gaming's acting CFO, Mr. Domijan. This referral is related to, if not squarely within, the scope of Mr. Mead's duties as general manager. Thus, Mr. Mead's statements in Exhibit 1048-R are admissible as statements by a party opponent.

## II. *Burden of proof*

Taxpayers generally bear the burden of proving that the Commissioner's determinations in a Notice of Deficiency are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and establishes that he or she complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, maintain required records, and cooperate fully with the Commissioner's reasonable requests. § 7491(a). Petitioners have neither claimed, nor introduced credible evidence sufficient to show, that the burden of proof should shift to respondent as to any relevant factual issue. *See id.* Therefore, the burden of proof remains with them.

## III. *Theft loss*

Section 165(a) permits a deduction for losses sustained during the taxable year and not compensated for by insurance or otherwise. In the case of an individual, a loss is deductible under section 165(a) only if the loss (1) is "incurred in a trade or business"; (2) is incurred in a "transaction entered into for profit"; or (3) "arise[s] from fire, storm, shipwreck, or other casualty, or from theft." § 165(c).

To establish a theft loss, a taxpayer first must prove that a theft occurred under the law of the relevant jurisdiction. *See Monteleone v. Commissioner*, 34 T.C. 688, 692 (1960) ("For tax purposes, whether a theft loss has been sustained depends upon the law of the jurisdiction wherein the particular loss occurred."); *Enis v. Commissioner*, T.C. Memo. 2017-222, at \*18 ("[T]he taxpayer must prove . . . that a theft actually occurred under the law of the relevant State . . . [or] under an applicable Federal criminal statute."). The taxpayer then must establish

[*11] the amount of the loss and the year in which the loss was sustained. *See* Treas. Reg. § 1.165-1(c) and (d)(1). A loss arising from theft generally is treated "as sustained during the taxable year in which the taxpayer discovers such loss." § 165(e); *see* Treas. Reg. § 1.165-1(d)(3).

### A. *Occurrence of a "theft"*

A taxpayer must prove by a preponderance of the evidence that an actual theft occurred. *See, e.g.*, *Bruno v. Commissioner*, T.C. Memo. 2020-156, at *15–16; *Enis*, T.C. Memo. 2017-222, at *18. The parties agree that we look to the law of the Turks and Caicos to make this determination.

Rule 146 provides that in determinations concerning foreign law, this Court "may consider any relevant material or source, including testimony." And "expert testimony accompanied by extracts from foreign legal materials has been and will likely continue to be the basic mode of proving foreign law." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1000 (9th Cir. 2001) (quoting *Universe Sales Co. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999)). At trial we expressed our desire for expert testimony addressing the relevant Turks and Caicos law.

Petitioners, who bear the burden of proof, have failed to offer any admissible[6] expert testimony to assist us in reconciling their factual allegations with the Turks and Caicos Theft Ordinance. Consequently, we must discern the applicability of the Theft Ordinance here on our own.

### 1. *Turks and Caicos Theft Ordinance*

Under Turks and Caicos law, "[a] person is guilty of theft if he dishonestly appropriates property belonging to another with the intention of permanently depriving the other of it." Theft Ordinance, c. 3.10, § 3 (2009) (Turks & Caicos Is.). The term "property" includes money. *Id.* § 6.1.

The Theft Ordinance creates a separate offense for theft by deception, providing that "[a] person who by any deception dishonestly obtains property belonging to another, with the intention of permanently depriving the other of it, shall be liable on conviction on

---

[6] In our Order dated June 5, 2024, we excluded Mr. Karam's expert report and related testimony for failure to comply with Rule 143(g).

[*12] indictment to a term of imprisonment of ten years." *Id.* § 24.1. "Deception" is defined, in part, as "any deception (whether deliberate or reckless) by words or conduct as to fact or as to law, including deception as to the present intentions of the person using the deception." *Id.* § 2.1. We refer to the first crime as "theft," and the second as "theft by deception."

### 2.    *Petitioners' allegations*

Petitioners allege that in 2008 Messrs. Tatum and Olson misappropriated $2 million of the $2,500,000 paid to VT Enterprises in exchange for 25 shares in Carib Gaming. They contend that "none of those monies were used as represented to [petitioners] by Jack Tatum and VT Enterprises Ltd. to inject additional capital into Carib Gaming," to complete the casino project. This claim is based primarily upon the testimony of Mr. Karam.

Mr. Karam testified that in 2014 Mr. Tatum sought to raise additional capital for Carib Gaming. During due diligence for a potential investment by Dr. P, an unrelated third party, Mr. Tatum purportedly admitted to Mr. Karam that he transferred $2 million of petitioners' 2008 investment to his and Rick Olson's personal bank accounts. Because of these transfers, Mr. Tatum needed an additional injection of capital from other investors, such as Dr. P, to finish the casino project. Mr. Tatum then vomited in Mr. Karam's office and left. He has not returned to the Turks and Caicos since.

Mr. Karam shared the purported confession with both Dr. P and Mr. Potts. Dr. P did not pursue the Carib Gaming investment. Mr. Potts engaged Mr. Karam to negotiate the purchase of VT Enterprises' remaining shares in Carib Gaming. These negotiations resulted in the 2014 Purchase Agreement.

### 3.    *Name and location of the casino project*

One of the most vivid elements of petitioners' narrative was the name of the planned casino. The parties devoted considerable time, both at trial and in posttrial briefing, to this point.

Petitioners characterize the casino project as the Fitzgeralds Casino. Mr. Potts testified that as part of the pitch, Mr. Tatum represented that he had purchased a historic neon sign from a Las Vegas casino with the intention to install it at the Airport Hotel casino. Mr.

**[*13]** Boyce, the owner of the Airport Hotel, testified that at some point Mr. Tatum discussed the installation of the Fitzgeralds sign with him.

Mr. Potts also described the location for the proposed casino as the Slots of Fun gaming parlor. Respondent adopts this label, noting that the casino project was described as Slots of Fun in petitioners' Petition, the MOU, and a 2017 affidavit signed by Mr. Potts. Testimony was inconsistent as to whether Slots of Fun represented a separate existing gaming establishment at the Airport Hotel.

The parties agree on two points: construction began in the Airport Hotel space, and the Fitzgeralds sign never appeared in the Turks and Caicos. The name of the casino project, and the existence of a sign, is ultimately of little relevance to the question we must decide: whether petitioners incurred a theft loss attributable to their 2008 purchase of Carib Gaming shares. We therefore simply refer to the venture as the casino project, and its location as the Airport Hotel.

4. *Whether petitioners have proven a theft occurred under the Turks and Caicos Theft Ordinance*

Under the Turks and Caicos Theft Ordinance, both theft and theft by deception require three basic elements: (1) the appropriation of property belonging to another, (2) through dishonesty or deception, (3) with the intention to permanently deprive the other of it. Theft Ordinance, c. 3.10, §§ 3, 24.1 (2009) (Turks & Caicos Is.).

a. *Appropriation of property belonging to another*

To prevail, petitioners need to establish that the $2 million did not belong to Messrs. Tatum and Olson. We struggle to see how Messrs. Tatum and Olson misappropriated the funds given the structure of the 2008 Purchase Agreement. Petitioners did not invest directly in Carib Gaming, either by way of a contribution to its capital or through the purchase of newly issued shares directly from it. Instead, they purchased existing Carib Gaming shares from another shareholder, VT Enterprises, which was controlled by Messrs. Tatum and Olson.

Neither the MOU, nor the 2008 Purchase Agreement, nor the Shareholder Agreement required VT Enterprises to use in any particular way the proceeds from petitioners' purchase of Carib Gaming shares. That is, none of these agreements imposed a legal obligation on VT Enterprises to reinvest or contribute the sale proceeds towards the

[*14] casino project (nor did they create any other restrictions on VT Enterprises' use of the sale proceeds). Petitioners never held an interest in VT Enterprises and had no say in how it, as the seller, used the sale proceeds, either.

Petitioners maintain that the casino project was the primary purpose for their investment in Carib Gaming and that Mr. Tatum promised that the 2008 sale proceeds would be used to inject additional capital into Carib Gaming. Petitioners have not introduced any evidence of this purported intent, other than Mr. Potts's testimony that Mr. Tatum orally promised that the proceeds would be reinvested into the casino project.

Even if we accept that these oral promises were made, they were not memorialized in the 2008 Purchase Agreement. And that Agreement specified it "represent[ed] the only agreement among the parties . . . and supersede[d] all prior agreements whether written or oral."

We also note that the Theft Ordinance provides a specific offense for false statements by company directors or officers. Theft Ordinance, c. 3.10, § 31 (2009) (Turks & Caicos Is.). The section requires "a written statement or account" which is misleading, false, or deceptive. *Id.* While petitioners have not cited this section, its requirement that the fraudulent statement be written weakens their claim of a theft under Turks and Caicos law (a deceptive written statement is absent from the record).

Petitioners identified no binding requirement that VT Enterprises contribute the sale proceeds to Carib Gaming, nor did we in our review of the record. We therefore cannot conclude that Messrs. Tatum and Olson misappropriated the funds within the meaning of the Turks and Caicos Theft Ordinance.

We also question whether an actual appropriation occurred. Petitioners received exactly what was agreed upon in the 2008 Purchase Agreement: 25 shares of Carib Gaming. Petitioners purchased stock in an established business that recorded $20,913,449 in gross revenue in 2007. By all indications, petitioners believed they had made a lucrative investment; they listed the value of their Carib Gaming interest at $6 million on personal financial statements completed in 2009 and 2010.

Petitioners also received dividends and distributions from Carib Gaming after the 2008 Purchase Agreement. Mr. Potts testified that they received dividends or distributions from Carib Gaming "many

[*15] times" and later stated that they received "approximately 10 dividends." Petitioners identified $500,000 and $200,000 of income from Carib Gaming on their 2009 and 2010 personal financial statements, respectively.

Petitioners contend that many of the payments were attributable to Carib Gaming's routing agreements with petitioners' other gaming establishments, rather than their interest in Carib Gaming. This would explain some of the payments, but Mr. Potts also admitted that petitioners received dividends from Carib Gaming attributable to their ownership.

b.      *Dishonesty or deception*

This Court has sustained theft loss deductions where the theft involved false representations made to the taxpayer which induced him or her to part with property. *Paine v. Commissioner*, 63 T.C. 736, 740 (1975) (first citing *Nichols v. Commissioner*, 43 T.C. 842 (1965); then citing *Monteleone*, 34 T.C. 688; and then citing *Morris Plan Co. of St. Joseph v. Commissioner*, 42 B.T.A. 1190 (1940)), *aff'd*, 523 F.2d 1053 (5th Cir. 1975) (unpublished table decision).

Petitioners have not shown that they were fraudulently induced to invest in Carib Gaming. They introduced no credible evidence to suggest that Mr. Tatum or VT Enterprises misrepresented any material fact concerning Carib Gaming's condition as of the transaction date. That is, they have not shown that Mr. Tatum misled petitioners as to any existing fact.

Instead, they rely upon Mr. Tatum's alleged promises that in the future he would inject the sale proceeds into Carib Gaming and complete the casino project. Petitioners do not offer, nor can we identify, any authority suggesting that under Turks and Caicos law a theft by deception can be based on promised future intentions.

We are left only with the Theft Ordinance, which characterizes deception as "any deception (whether deliberate or reckless) by words or conduct as to fact or as to law, including deception as to the present intentions of the person using the deception." Theft Ordinance, c. 3.10, § 2.1 (2009) (Turks & Caicos Is.). Absent any authority suggesting otherwise, we decline to read "as to fact" or "present intentions" to encompass future intentions, especially against the backdrop of our own caselaw. *See Paine*, 63 T.C. at 742.

**[\*16]**　　　　　　　c.　*Prior caselaw addressing fraudulent inducement*

In support of their position petitioners cite several cases addressing fraudulent inducement, including *First Chicago Corp. & Affiliated Corps. v. Commissioner*, T.C. Memo. 1995-109, 1995 WL 116286, and *McComb v. Commissioner*, T.C. Memo. 1977-176, 1977 Tax Ct. Memo LEXIS 265.

Petitioners' reliance on these cases is misplaced. In *First Chicago Corp. & Affiliated Corps. v. Commissioner*, 1995 WL 116286, at \*15, this Court sustained a theft loss deduction for a taxpayer that injected capital into a Brazilian bank, relying on fraudulently misrepresented financial information. Significantly, *First Chicago* contemplated a direct injection of additional capital, rather than the purchase of existing shares from other shareholders. More importantly, the Court in *First Chicago* relied upon the fact that the Brazilian bank's financials were fraudulently misrepresented to the taxpayer as of the transaction date. *Id.* at \*14. That is, the fraudulent misrepresentations in *First Chicago* concerned then-existing facts, not future intentions.

*McComb*, 1977 Tax Ct. Memo LEXIS 265, at \*3–10, considered a corporation's president's absconding with the taxpayer's investment in that corporation. This Court concluded that the president fraudulently induced the taxpayer both "with representations by [the president] which were false and promises which [the president] did not intend to carry out." *Id.* at \*23.

*McComb* hinged on a finding that the president never intended to honor the promises, a fact petitioners have not established here. *See id.* Petitioners offered no evidence that Mr. Tatum did not intend to build out the casino at the time he made the casino project sales pitch to Mr. Potts. They rely only on Mr. Tatum's statements from 2014 (as recounted by Mr. Karam), six years after petitioners' initial investment in Carib Gaming.

Likewise, petitioners failed to establish the timing of the alleged transfers to Messrs. Tatum's and Olson's personal bank accounts. Petitioners would like us to infer that the $2 million was transferred immediately; however, nothing in the record supports that proposed finding.

Our review of this record raises more questions than it answers. While we recognize the challenge posed by Mr. Tatum's unavailability

[*17] at trial, petitioners have not filled the resulting gaps with evidence sufficient to carry their burden of proof. They did not introduce any admissible evidence (e.g., wire transfers, bank statements, correspondence, etc.) corroborating a purported misappropriation.

Finally, we return to the effect, if any, of Mr. Tatum's purported confession. We did not find Mr. Karam to be a credible fact witness. He was often vague and evasive regarding his involvement in the 2014 proposed transaction with Dr. P. Mr. Karam initially suggested that he represented petitioners in the transaction but later stated: "I wasn't advising [Mr. Potts]." He later clarified that he was representing Dr. P, before finally stating that he was acting "for the deal." We also note that Mr. Karam represented petitioners in the subsequent 2014 Purchase Agreement. This Court is under no obligation to accept uncorroborated or self-serving testimony. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

Ultimately, even if we accept Mr. Tatum's purported confession as recounted by Mr. Karam, petitioners still have not met their burden of proving a theft occurred. Mr. Tatum's promises were never memorialized; and the 2008 Purchase Agreement, which did not create a binding requirement that VT Enterprises reinvest the sale proceeds, constituted the entire agreement between the parties. Therefore, Mr. Tatum's statements do not constitute an admission to a theft.

B.     *Proper party to claim any theft loss deduction*

Aside from whether petitioners proved a theft under Turks and Caicos law, we question whether petitioners are the proper parties to claim any theft loss deduction. They transferred the $2,500,000 purchase price to the trust account of VT Enterprises' counsel. Any theft or embezzlement was of funds held by VT Enterprises.

"A theft loss deduction may be claimed only by the taxpayer who was the owner of the stolen property when it was criminally appropriated." *Malik v. Commissioner*, T.C. Memo. 1995-204, 1995 WL 273982, at *3 (first citing *Lupton v. Commissioner*, 19 B.T.A. 166 (1930); and then citing *Silverman v. Commissioner*, T.C. Memo. 1975-255, *aff'd*, 538 F.2d 320 (3d Cir. 1976) (unpublished table decision)) (holding that a taxpayer who transferred funds to a dance club to establish the business could not claim a theft loss deduction because the club (not the taxpayer) had possession and control, and therefore ownership, of the funds when they were embezzled). This Court has consistently

**[\*18]** disallowed theft loss deductions where, according to the applicable local law, the taxpayer did not own the property at the time of the theft. *See id.*; *see also Giambrone v. Commissioner*, T.C. Memo. 2024-47, at \*13; *Grothues v. Commissioner*, T.C. Memo. 2002-287, 2002 WL 31662269, at \*6–7.

Any purported embezzlement by Messrs. Tatum and Olson did not deprive petitioners of their property (the 25% interest in Carib Gaming), but instead deprived VT Enterprises of funds belonging to it. This conclusion does not change if we accept Mr. Potts's testimony as to Mr. Tatum's intentions for the sale proceeds. Any theft loss deduction would belong to Carib Gaming, not petitioners.

We note that the disallowance of the theft loss deduction does not necessarily foreclose eventual recognition of a loss. Petitioners presumably have a basis in the Carib Gaming shares; to the extent that the shares indeed diminished in value, petitioners may be entitled to claim a loss deduction upon their disposition (an issue not before us).[7]

IV. *Accuracy-related penalty*

The Notice of Deficiency determined an accuracy-related penalty on the basis of an underpayment due to negligence, or, alternatively, to a substantial understatement of income tax. Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if the underpayment is attributable to "[n]egligence or disregard of rules or regulations" or a "substantial understatement of income tax."

The Commissioner bears the burden of production with respect to the liability of an individual for any penalty. *See* § 7491(c); *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). In particular the Commissioner must show that he complied with the section 6751(b)(1) written supervisory approval requirement. § 7491(c). The record demonstrates, and petitioners do not dispute, that respondent complied with the requirements of section 6751(b).

---

[7] We observe that petitioners have not claimed a loss deduction for worthless securities pursuant to section 165(g). *See* Treas. Reg. § 1.165-4(a) ("A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss.").

[*19] Once the Commissioner satisfies his burden of production, the taxpayer bears the burden of proving that the Commissioner's determination is incorrect or that the taxpayer has an affirmative defense such as reasonable cause. *See* § 6664(c); Rule 142(a); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).

### A. *Negligence and substantial understatement of income tax*

"Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances." *Mill Rd. 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *70 (citing *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010)). It "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1).

An understatement is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. § 6662(d)(1)(A). Respondent determined that the tax required to be shown on petitioners' 2014 federal income tax return is $443,918. Petitioners reported no federal income tax liability on their return. Their understatement of tax thus exceeds 10% of their total liability; accordingly, there is a substantial understatement of income tax.

### B. *Reasonable cause*

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. *See* § 6664(c)(1); *Higbee*, 116 T.C. at 448. We decide whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.*

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). Reliance on the advice of a professional tax advisor may, but does not necessarily, demonstrate reasonable cause. *See* Treas. Reg. § 1.6664-4(b)(1). The taxpayer must show by a

**[*20]** preponderance of the evidence that the reliance on the advice was reasonable: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs.*, 115 T.C. at 99.

Petitioners contend that they acted in good faith in preparing and filing their 2014 federal income tax return. They point out that McGladrey prepared their 2014 federal income tax return and that they provided financial information for their Turks and Caicos entities.

Petitioners have not introduced any documentation to suggest that McGladrey opined upon their entitlement to the theft loss deduction. Nor is there any indication that petitioners provided McGladrey with the necessary information to determine whether the deduction was appropriate.

These documents were sought during pretrial discovery. Respondent's Request for Production of Documents, and subsequent Motion to Compel Production of Documents, filed August 19, 2022, sought "[a]ll documents provided to a CPA, Enrolled Agent, [or] return preparer" and "[a]ll documents related to advice, recommendations and other communications provided to [p]etitioners" by said return preparers.

Petitioners explained that many of the documents sought by respondent's Motion to Compel Production of Documents were destroyed by a storm or otherwise unavailable. In our Order dated February 2, 2023, we cautioned petitioners that "if they fail to produce documents (or we exclude them as produced late) petitioners will have to demonstrate why their failure to produce those documents should not give rise to a negative inference." Even without any negative inference, the lack of evidence leaves a hole in petitioners' proof. They did not try to fill it with any testimony other than Mr. Potts's. We therefore conclude that petitioners have not carried their burden to prove that they acted with reasonable cause and in good faith.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

**[*21]** Because of concessions,

*Decision will be entered under Rule 155.*